IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JERRY SCHOEN,                              )
                                          )
            Plaintiff,                     )
                                          )
v.                                        )     CIVIL ACTION NO. 21-00265-JB-N
                                          )
STATE FARM FIRE AND CASUALTY COMPANY,     )
                                          )
            Defendant.                     )

**ORDER**

A.    **Factual Background**

      1.    In this action for alleged breach of a homeowner's insurance policy issued by
Defendant State Farm Fire and Casualty Company ("State Farm") to the Plaintiff Jerry Schoen
("Schoen"), State Farm has filed a motion, based on Fed. R. Civ. P. 702 and 703, to exclude the
expert testimony of Plaintiff's designated expert, Darrell Steward, who has been identified as
providing expert testimony regarding the reasonable and necessary costs to repair damages
allegedly caused by Hurricane Sally to Schoen's insured premises (the "Property") (Doc. 28).  *See*
Plaintiff's Expert Disclosures at page 2 (Doc. 28-1, PageID.197).  Schoen disclosed that Steward
would testify as reflected on a two-page spreadsheet attached as Exhibit E to Plaintiff's expert
disclosures (Doc. 28-1, PageID.200-201) (hereinafter the "Nielsen estimate").  His opinions
included both the cost and scope of the repairs needed (Steward Deposition at 51:1-6,
PageID.209).

      2.    At his deposition, Steward testified that he did not prepare the Nielsen estimate
(Darrell Steward Depo. at 42:6-24, Depo. Ex. 2) (Doc. 28-1, PageID.207, 215-216).  Nor did he

prepare a similar spreadsheet of costs of repair for the property of his brother Randy Schoen who has also filed an action in this Court, Case No. 2021-264-JB-N (Id.). Both were prepared in their "entirety" by his estimator, Jay Nielsen, using a combination of Nielsen's own personal knowledge and some in-house information. (Steward at 27:23-28:1, 29:5-7, 45:12-19) (Doc. 28-1, PageID.204-207). Nielsen sent his estimate to Steward. Without looking at the Property himself, Steward then called Nielsen to confirm that Nielsen felt good about the numbers on the estimate and then emailed that estimate to Schoen's counsel, Andrew York, without making any changes to it. (Steward at 32:6-25) (Doc. 28-1, PageID.205). York then produced the Nielsen estimate as part of Plaintiff's Expert Disclosures on February 11, 2022. (Doc. 19, Doc. 28-1, PageID.200-201). Nielsen was not disclosed as a testifying expert in those expert disclosures.

3.       Several weeks later, on March 3, 2022, 5 days before his deposition on March 8, Steward visited the Property for the first time, reviewing the information on Nielsen's estimate (Steward at 33:6-22) (Doc. 28-1, PageID.205). Any information Steward obtained during this walk-through did not impact the estimate prepared earlier by Nielsen and emailed to Schoen's counsel (Steward at 33:16-22) (Doc. 28-1, PageID.205). Steward made no changes to the Nielsen estimate as a result of his visit (Steward at 45:20-22) (Doc. 28-1, PageID.207).

4.       At his deposition, Steward was questioned about the Nielsen estimate, marked as Exhibit 2 (Doc. 28-1, PageID.215-216), line item by line item (Steward at 46-72) (Doc. 28-1, PageID.208-214). As shown below, he displayed little memory of the conditions of the Property, and little understanding of fundamental aspects of the Nielsen estimate, including how the costs were derived, and he admitted the estimate contained numerous errors, including costs to repair or replace property that did not exist or were not damaged in the hurricane.

a.      Steward did not know the meaning of some of the categories of information shown on the Nielsen estimate, such as the columns labelled "U.P.L.M." and "U.P.L." which are categories of some costs (Steward at 46:4–15; Depo. Ex. 2) (Doc. 28-1, PageID.208, 215).  He confused the "QTY." (quantity) column with the cost of repairs (Steward at 51:24-52:7) (Doc. 28-1, PageID.209).  He believed "MTLM." was an abbreviation for materials but testified that "I don't know why [Nielsen] categorized it as MTLM, but that's the way he's got it characterized.  I don't know." (Steward at 46:18-23) (Doc. 28-1, PageID.208).

b.      The Nielsen estimate contained a $4200 cost to wash, "repoint" and seal the masonry brick.  Steward was not sure what the "repointing" work was, speculating that it may have related to some metal studs around the windows, but admitted "…on this one, we're not sure." (Steward at 52:7-18) (Doc. 28-1, PageID.209).   And he could not say that this cost was caused by Hurricane Sally; this is just part of their standard procedure in doing any kind of work on such a job (Steward at 51:7-15) (Doc. 28-1, PageID.209).  Schoen's engineering expert, Martin Shields, testified that he did not observe any hurricane damage to the masonry (Shields at 84:20–85:3) (Doc. 28-1, PageID.219).  Steward testified that he would not disagree if Shields so testified. (Steward at 52:23–53:2) (Doc. 28-1, PageID.209).

c.      The Nielsen estimate contained the cost to paint 600 linear foot of fascia.  Steward admitted that Nielsen did not measure any damaged fascia and "pulled that off" the public adjuster's report (Steward at 47:17 – 48:3) (Doc. 28-1, PageID.208).[1]

---

[1] During the pendency of the insured claim, Schoen submitted a repair estimate from Noble Public Adjusting that was riddled with inaccuracies (Deposition of J. Schoen at 80-85) (Doc. 29-1, PageID.324-325.  Schoen acknowledged the estimate was "over the top" (Id. at 84:14-17) (Doc. 29-1, PageID.325).

d.      The Nielsen estimate contained the cost to repair a sliding patio door and a set of French doors through which water had penetrated.  But Steward did not know if that was a one-time water intrusion incident during Hurricane Sally or a continuing issue with leaking around those areas (Steward at 53:3-54:6) (Doc. 28-1, PageID.209).  He could not recall what was wrong with the double-hung window shown on the repair estimate that would necessitate its replacement (Steward at 54:9-18) (Doc. 28-1, PageID.210).  He acknowledged that the Nielsen estimate included the installation of an oval window instead of the gable end vent he believes was damaged by Hurricane Sally (Steward at 54:19-55:9) (Doc. 28-1, PageID.210).

e.      Steward did not know why Nielsen believed a new pool liner was needed, at a cost of $7,000; he thought that entry may have come off the public adjuster's report (Steward at 55:11-25) (Doc. 28-1, PageID.210).  He did not think the pool even had a pool liner (Steward at 56:1-3) (Doc. 28-1, PageID.210) and submitted an amended estimate at his deposition without that entry (Steward at 55:13) (Doc. 28-1, PageID.210).  He does not know why a new pool filter was needed, as shown on the Nielsen estimate.  He thought Spencer Cade, another employee, may have spoken to Schoen about this (Steward at 56:4-57:1) (Doc. 28-1, PageID.210).  Schoen had testified that the storm had not damaged his pool filter (Schoen at 81:24-82:4) (Doc. 29-1, PageID.324).  As for the pool enclosure, Steward testified "I don't have a good answer" as to why a complete removal and replacement of the pool enclosure was needed, at a cost of $18,750.00 as shown on the Nielson estimate (Steward at 57:2-14) (Doc. 28-1, PageID.210).  Schoen testified that the pool enclosure needed to be rescreened and have one corner repaired. (Schoen at 10:8-11:21) (Doc. 29-1, PageID.315).  Steward did not know how much it would cost to rescreen the pool (Steward at 57:18-21) (Doc. 28-1, PageID.210).

f.      The Nielsen estimate contains a cost for insulation board and house wrap behind the vinyl siding.  However, Steward did not know what, if anything, was behind the vinyl siding.  Assuming there was insulation board and house wrap, Steward did not know if Nielsen looked behind the vinyl siding to evaluate the integrity of the insulation board or house wrap.  Nor did Steward do that himself (Steward at 58:1-59:25) (Doc. 28-1, PageID.211).

g.      The Nielsen estimate contains a cost of $3,250 for installing 50 feet of a 6-foot vinyl fence although Steward admitted that he did not know what type of fence Schoen had (Steward at 60:1-12) (Doc. 28-1, PageID.211).  Schoen had a wooden fence (Shields at 104:6-8) (Doc. 29-1, PageID.558).

h.      The Nielsen estimate also calls for replacement of the roof with a new "standing seam roof," at a cost of $31,999.  (Steward Depo. Ex 2) (Doc. 28-1, PageID.215-216).  Steward agreed that Jerry Schoen did not have a standing seam roof but rather a "screw down" roof (Steward at 66:15-21) (Doc. 28-1, PageID.213).  He agreed that the price of a standing seam roof was more costly than a screw down roof, possibly twice as much. (Steward at 66:22-67:12) (Doc. 28-1, PageID.213).  Steward did not offer any opinion as to the cost to replace a screw down metal roof, which is what should have been estimated.

i.      The Nielsen estimate contains an amount for removing and reinstalling the decking on the roof.  Steward testified that they just put that item in there, without knowing whether the decking is damaged or not, so that, if it needs to be replaced, it will be replaced.  He also did not know what type of decking was on the house (Steward at 65:14-66:4) (Doc. 28-1, PageID.212).

j.      The Nielsen estimate calls for the removal of blown-in insulation. Schoen testified that he had removed all the blown-in insulation immediately after the Hurricane and that what remained was either not wet or had dried and was functional and without issues. (Schoen at 53:17-55:6) (Doc. 29-1, PageID.319-320).  Steward was not aware that Schoen had removed all of the wet insulation out of the attic after the storm. (Steward at 69:13-17) (Doc. 28-1, PageID.213). If that were true, they would not need to remove the blown-in insulation (Steward at 69:18-22) (Doc. 28-1, PageID.213).

k.      The Nielsen estimate calls for removing and replacing all drywall ceilings in the house, based on water staining. Steward agreed that not every water stain requires the entire sheetrock piece to be replaced; some water stains can be scraped, repainted and popcorn finish reapplied. (Steward at 70:24-71:4) (Doc. 28-1, PageID.214).  He did not test the integrity of the drywall where the staining was located (Steward at 70:21-23) (Doc. 28-1, PageID.214).  So, he cannot testify whether painting would have been a possible fix instead of replacing all the sheetrock.  (Steward at 71:5-9) (Doc. 28-1, PageID.214).  Steward did not know why two interior ceiling fans were shown on the estimate as needing to be removed and reinstalled new (Steward at 71:16-72:1) (Doc. 28-1, PageID.214).

B.      **Motion to Strike Affidavits**

In opposition to State Farm's motion, Schoen filed affidavits of Darrell Steward, Spencer Cade and Jay Nielsen (Doc. 32-1, PageID.645-656).  In response, State Farm filed a  motion to strike portions of the affidavit of Darrell Steward on the grounds that they contradicted his

deposition testimony and to strike the entirety of the affidavits of Spence Cade and Jay Nielsen because they were never disclosed as witnesses (Doc. 37).

**1.    Affidavit of Darrell Steward**

In the Eleventh Circuit, a district court may "disregard an affidavit as a matter of law when, without explanation, it flatly contradicts his or her own  prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." *Furcron v. Mail Centers Plus, LLC,* 843 F. 3d 1295, 1306 (11th Cir. 2016).

For the reasons discussed below, the Court finds that the following language in the following paragraphs in Steward's affidavit contradict Mr. Steward's prior sworn testimony at his deposition with no adequate explanation for the conflict:

**a.    *Paragraph 14***

In paragraph 14 of Steward's affidavit, he testified that Spencer Cade had discussed with him "measurements" he had made and the "damages" he had observed at the time of his inspection (Doc. 32-1, ¶14, PageId.647).  When asked at his deposition what Cade said when he reported back, Steward testified:

> Q.    So Spencer goes out there. He reports back to you?
> A.    Right.
> Q.    And he tells you one brother has done some repairs, and one brother hasn't done any repairs?
> A.    Correct.
> Q.    Did he tell you anything more specific than that?
> A.    Not really.
> Q.    Did he tell you the scope of the work or what was --
> A.    No.

 (Steward at 27:11-22) (Doc. 28-1, PageID.204).  Schoen argues that Steward's response "not really" was simply that Cade did not tell him anything "more specific" about this one subject of

one brother doing some repairs and another brother doing none, and that paragraph 14 of Steward's affidavit clarifies the entire conversation (Doc. 39, PageId.958).  But the following question — "Did he tell you what the scope of work . . . was" — evoked a one-word response of "no," confirming that Steward had already described all that was discussed in his conversation with Cade.  If Cade had told him about "measurements" he made and "damages" he observed, that certainly fell within the question about "scope of work."  Paragraph 14 of his affidavit contradicts his deposition testimony in these respects.

Schoen also seeks to show that paragraph 14 is not inconsistent with his deposition testimony by referencing his testimony in response to a question about the measurements of Schoen's property that, "if I am not mistaken, he took the [measurements] from the [Public Adjuster]." (Doc. 39, PageId.958) (referencing Steward Depo. at 47:18-25).  Steward was referring to what Nielsen did, not what Cade did.  (Steward Depo at 47:17-48:13) (Doc. 28-1, PageID.208).

Given this contradiction with the deposition testimony, the Court will disregard the statement in Paragraph 14 of Steward's affidavit that he discussed with Cade "the measurements, and the damages he observed at the time of his inspection."

### b.    Paragraph 20

In Paragraph 20 of Steward's affidavit he testified that, before sending the Nielsen's estimate to Schoen's lawyer, he "reviewed  the estimate and the information contained within the estimate, reviewed the claim file material that was previously sent, verified the information within the construction estimate was correct and accurate, and then approved the estimate be sent to Mr. Schoen's representative."  (Doc. 32-1, ¶20; PageID.643).  Steward does not identify what "claim file material" he reviewed, but presumably it included the "previous estimate

prepared by Noble Public Adjusting" that he gave to Nielsen, according to Paragraph 15 of his affidavit.  (Doc. 32-1, PageID.647).  At his deposition, he was asked whether he had ever reviewed the public adjusters' reports on Jerry Schoen's and his brother Randy's  properties, before his inspection of those properties on March 3, 2022, which was several weeks after he had sent the estimate to Schoen's counsel. Steward testified " I just briefly looked at them" (Steward at 36:15-22) (Doc. 36-1, PageID.919).

In response, Schoen argues that paragraph 20 of Steward's affidavit does not contradict his deposition testimony because he testified "I just briefly looked at them."  (Doc. 39, PageID.959). Whatever this "brief" look consisted of, it was not a "review" to "verify" the Nielsen estimate. Steward testified:

> Q.  Now, did you ever look at the public adjuster's report and confirm that any of the quantities that were being used matched up with what was in there?
>
> A.  No, sir, I didn't.

(Steward at 79:8-11) (Doc. 28-1, PageID.225)

The above-quoted deposition testimony shows Steward did not "verify" that the information in the Nielsen estimate was "correct and accurate," by comparing it to the public adjuster's report.  Furthermore, not having visited the Property himself before sending the Nielsen estimate to Schoen's counsel, he could not "verify" the accuracy of the estimate.  The Court will therefore disregard Steward's affidavit testimony that, before sending on the Nielsen estimate to Schoen's counsel, Steward "verified the information within the construction estimate was correct and accurate…."

### c.    Paragraph 21

At paragraph 21 of his affidavit, Steward testified that he inspected the Property with the Nielsen estimate in hand, and "verified that the information contained within the [Nielsen] estimate was correct and accurate." This testimony is inherently inconsistent with his deposition testimony, which demonstrated his complete inability to "verify" anything about the line items in the Nielsen estimate, as discussed above in the Factual Background.  Indeed, as he admitted at his deposition, the Nielsen estimate described a number of items that were not damaged in the hurricane.  And it contained some blatant errors on its face.  This affidavit testimony is also inconsistent with his deposition testimony, discussed above, that he never verified the Nielsen estimate against the public adjuster report, to see if the quantities matched up.  The Court will therefore disregard the affidavit testimony of Steward, at Paragraph 21, that he "verified that the information contained within the [Nielsen] estimate was correct and accurate."

### d.       Paragraph 26

Steward describes in his affidavit a "clerical" error in the Nielsen estimate in its description of the type of roof inputted into the system (Doc. 32-1, ¶26; PageID #: 648).  Steward claims that the cost attributed to a "New Standing Seam Roof" in the Nielsen estimate is in fact not the cost of such a roof but that of a "screw-down" roof, which is what Mr. Schoen had on his home (Id.).

Mr. Steward was questioned about Mr. Schoen's roof during his deposition, including what type of roof was on the house compared to what was in the Nielsen estimate.  Mr. Steward testified that the Nielsen estimate contained a price of $22,200 for a new "standing seam" roof and that this was a more expensive roof than the screw-down roof he had on his home (Steward at 66:15-67:12) (Doc. 28-1, PageID.213).  Steward did not describe any "clerical" error at his deposition.  His affidavit testimony at paragraph 26 flatly contradicts his deposition testimony

that $22,200 was the cost of a new "standing seam" roof. The Court has not been given any supporting documentation that shows that $22,200.00 is the cost of a screw-down roof, rather than a standing-seam roof as shown on the Nielsen estimate. The Court simply has Steward's *ipse dixit* to support this, which contradicts the *ipse dixit* of the Nielsen estimate itself.

Indeed, the Nielsen estimate is not the only estimate to state that the price of a standing seam roof is $22,200. The Noble Adjusting estimate also describes the cost of a "standing-seam roof" to be essentially the same — $22,040.00, after deduction of an amount for overhead and profit for this cost item (Doc. 40, PageID.987) That two separate, unrelated estimators would have made the same mistake in misdescribing the cost of a screw-down roof to be that of a standing-seam roof, is not a credible proposition. Unless, of course, Mr. Nielsen simply copied this "clerical" error from the Noble Adjusting estimate into his estimate, without independently determining the replacement cost of the roof on Schoen's house. If this explains the error, this simply exacerbates the unreliability of the Nielsen estimate in its description of the replacement cost of the roof on Schoen's house, and thus the inadmissibility of Steward's opinion testimony under F.R.E. 703, where that opinion is based on this inadmissible Nielsen estimate and that estimate is so unreliable that other experts in his field would not "reasonably rely" on it. *See In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999)

In addition to contradicting his prior testimony, Mr. Steward's affidavit is also now testimony as to the $22,200 being cost of a "screw-down" roof is an additional expert opinion that was not disclosed. Schoen has never disclosed that Mr. Steward, or any witness, would testify as to the cost of a screw down roof like Mr. Schoen has on his home.

Schoen claims that this affidavit testimony is not a new, undisclosed expert opinion because "Steward's opinion, that the cost reflected within the estimate is the reasonable cost for Schoen's roof, has been disclosed and known by the Defendant since the day that Schoen disclosed his experts."  (Doc. 39, PageId.961).  To the contrary, what the Nielsen estimate disclosed to State Farm was not the reasonable cost for the replacement of a screw-down roof, like the one on Schoen's house, but rather the cost of a standing-seam roof, which State Farm knew was an upgrade, based on its inspections of the Property.  State Farm did not know, and had no reason to know, that the Nielsen estimate purportedly used the cost figure for the replacement of a "screw-down" roof and mistakenly assigned it to a "standing-seam" roof.  It reasonably assumed that the Nielsen estimate was pricing an upgraded roof, which was what Steward confirmed at his deposition.

In summary, Steward's affidavit testimony that $22,2000 is the cost of a screw-down roof is a new and different opinion from the opinion he gave at his deposition.  If the Nielsen estimate had mistakenly described the cost of a screw-down roof as the cost of a standing seam roof, Steward should have been prepared to testify to that error at the time of his deposition, which was the one and only time State Farm had to examine him concerning his opinions.

In summary, paragraph 26 of the affidavit testimony of Steward regarding the "clerical" error in describing the cost of replacing Schoen's roof is in fact a direct contradiction of his testimony and also constitutes a new, previously undisclosed expert opinion.  The Court will therefore disregard paragraph 26 of Darrell Steward's affidavit).

**2.      Affidavits of Spencer Cade and Jay Nielsen**

The two other affiants, Spencer Cade, and Jay Nielsen, employees of Steward Construction Company, were not identified by Schoen as a witness, expert or otherwise, in his initial disclosures or in any of his interrogatory responses.  (Doc. 37, PageID.943-954).

Fed. R. Civ. P. 26(a)(1)(A)(i) requires that each party make an initial disclosure of the name, address and telephone number of each individual likely to have discoverable information, along with the subjects of that information, that the disclosing party may use to support his claims or defenses.   Rule  26(e)  requires  that  these  disclosures  be  supplemented  as  the  litigation progresses.  Fed. R. Civ. P. 37(c)(1) states that if a party fails to identify a witness as required by Rule 26(a) or (e), that party may not be allowed to use that witness to supply evidence at a motion, at a hearing or any trial "unless the failure was substantially justified or his harmless."

Schoen argues that neither Cade nor Nielsen had any involvement in the case when the initial disclosures were served on State Farm (Doc. 39, PageID.961).  But this does not excuse Schoen from supplementing his disclosures as required under Rule 26(e).  Schoen argues that his failure  to  supplement  his  disclosures  was  substantially  justified  and  harmless  because  their identity and involvement were disclosed at Steward's deposition. (Doc. 39, PageID.962-963). Whatever State Farm may have learned about these two individuals from Steward at his deposition, and the role they played in Steward's evaluation of the damages, it was not put on notice that they would testify in a manner inconsistent with Steward's description of their role at his deposition.  As discussed above, Steward testified that, after looking at the properties of Jerry Schoen and his brother Randy, Cade did nothing more than report back to him that one had done repairs and the other had not. At a minimum, following Steward's deposition, counsel should have supplemented his disclosures to add them as witnesses, and address the subject of their

testimony, before discovery cutoff. Schoen's failure to do so was neither substantially justified nor harmless.  The Court will disregard these affidavits for purposes of State Farm's motion to exclude.

Additionally, Mr. Nielsen, through his affidavit, offers an expert opinion that was not disclosed by Schoen.  Nielsen asserts in his affidavit that he incorrectly inputted information into his estimate and that the price in the estimate that is listed for a "new standing seam roof" is actually the cost of an "R-panel metal roof, which is the type of roofing system Jerry Schoen has on his house."  (Doc. 32-1, ¶14; PageID.654-656).  Neither Nielsen nor any other witness in this case has been disclosed as offering opinion as to cost of a screw-down or R-panel metal roof.  The Court shall therefore disregard this new undisclosed opinion testimony on the grounds that Schoen has not complied with Fed. R. Civ. P. 26(a)(2)(B) and thus this testimony is to be excluded under Rule 37(c)(1).

**C.**    **Motion to Exclude Darrell Steward's Expert Testimony**

Even if this Court were to consider the three affidavits filed by Schoen, they do not affect the conclusion of this Court that Darrell Steward  is merely serving as the "mouthpiece" for his estimator Jay Nielsen, who was never disclosed as an expert witness,  rather than expressing any opinions of his own based upon reliable facts or data supplied by Mr. Nielsen.  His opinions regarding the reasonable and necessary costs of repair are therefore inadmissible under Fed. R. Evid. 703, as discussed below. His opinions are also inadmissible under Fed. R. Evid. 702 because his conclusions are not sufficiently reliable under Daubert standards and his testimony will not assist the trier of fact, as discussed below.

**1.**    **Rule 703**

Fed. R. Evid. 703 governs the permissible basis for an expert's opinion testimony and provides:

> "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in a particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

Although Rule 703 permits experts, in some circumstances, to provide opinions based on facts and data otherwise inadmissible in evidence, the Rule "is not an open door to all inadmissible evidence disguised as expert opinion." *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987).  "[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, No. 8:12-CV-691-T-24-MAP, 2014 WL 4986482, at *2 (M.D. Fla. Oct. 6, 2014) (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013)).  "If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then . . .the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 684183, at *2 (N.D. Fla. Feb. 11, 2021) (quoting *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012)); *see La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, 586 F. Supp. 3d 1300, 1307 (S.D. Fla. 2022) (A witness may not, "under the guise of giving expert testimony . . . [,] become the mouthpiece of the witness on

whose statements or opinions the expert purports to base his opinion.") (quoting *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013).

"Expert opinions ordinarily cannot be based upon the opinion of others whether those opinions are in evidence or not." *Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985). Rule 703 "does *not* permit an expert to 'simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.' ". *La Gorce Palace Condominium Association, Inc.*, 586 F. Supp. 3d at 1306 (emphasis in original) (quoting *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000). Although Rule 703 permits experts to rely on opinions of other experts in some circumstances, "the expert witness must in the end be giving his *own* opinion.  He cannot simply be a conduit for the opinion of an unproduced expert." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (emphasis in original); *see United States v. McLean*, 695 F. App'x 681, 685 (4th Cir. 2017) (absent an *independent opinion* based upon a reliable methodology, the expert is "little more than a conduit or transmitter for [] hearsay.") (emphasis added); *PODS Enterprises, Inc. v. U-Haul Int'l, Inc.*, No. 812CV01479T27MAP, 2014 WL 12628662, at *2 (M.D. Fla. July 2, 2014) (expert's references to another expert's surveys are inadmissible where expert "does nothing more than parrot [the other expert's] findings and opinions, . . . ."); *Deutz Corp. v. City Light & Power, Inc.*, No. 1:05-CV-3113-GET, 2009 WL 2986415, at *6 (N.D. Ga. Mar. 21, 2009) (Rule 703 "does not permit an expert to simply parrot the opinions of other experts"); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . ., such expert must make some findings and not merely regurgitate another expert's opinion."); *In re Sulfuric Acid*

*Antitrust Litig.*, 235 F.R.D. 646, 653 (N.D. Ill. 2006) ("[O]ne expert cannot be the mouthpiece for another.");

In *Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL 779283 (S.D. Ala. Mar. 2, 2010) (Steele, C. J.), Judge Steele recognized this rule against permitting experts to merely "parrot" the opinions of others as enjoying "broad acceptance among federal courts." *Id.* at *4 n. 9.

In *La Gorce Palace Condominium Association, Inc.*, 586 F. Supp. 3d 1300, a condominium association brought an action against an insurer alleging breach of a property insurance policy for failure to pay for damages in the wake of Hurricane Irma.   The insurer commissioned a team from Young & Associates to evaluate the claim.   That team prepared an Xactimate report valuing the plaintiff's claim and sent the insurer two iterations of its report, one in 2017 and a revised version in 2019.  *Id.*  at 1303.  The insurer disclosed Mr. Neal Morley, one of the members of the four-person team from Young & Associates, to provide expert testimony on the cost of the damage incurred during Irma.  *Id.* at 1304.  Mr. Morley had almost no role in preparing the Xactimate report; his conclusions relied heavily upon the Xactimate report prepared by another member of his team, Jake Belleavoine.  *Id.*  Mr. Morley did visit the site during the investigation, alongside Mr. Belleavoine, who took notes from Mr. Morley.  But it was Mr. Belleavoine who came up with the input values and had Xactimate crunch the numbers.  The only thing Mr. Morley did was read the report and relay its conclusions.  *Id.*

In addressing the admissibility of the testimony of Morley and Belleavoine, the district court in *La Groce* noted that it had previously granted the plaintiff's *Daubert* motion to strike the testimony of Mr. Morley, on the basis that Morley's "[m]ere recitation of the major points from

Mr. Bellavoine's report, without knowledge of how Mr. Bellavoine put the report together in the first instance, would not pass as expert testimony" Id. at 1304.  The court quoted the Seventh Circuit's comment that "[a]n expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *Id.*  (quoting *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014)).

The court also ruled that Bellavoine was in the same position as Morley with respect to the additional valuations in the 2019 "revised" report that he did not prepare.  *Id*. at 1307.  Belleavoine acknowledged his ignorance regarding the additional items for repair in the 2019 "revised" report that were not contained in the earlier report he prepared.  *Id.* The court concluded that if Mr. Belleavoine were to testify about the 2019 revisions, "he would be no different than Mr. Morley:  A mere 'mouthpiece' for someone else's out of court statements." *Id.* (citing *Factory Mut. Ins. Co.*, 705 F.3d at 524).  He would not be "sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination." *Id*. (quoting *In re Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d at 1357).  Thus, plaintiff's motion to strike the testimony of Belleavoine was due to be granted with respect to the new material included in the revised report.  *Id.*

To find legal support for the admissibility of Steward's testimony, Schoen cites *Abrams*, 2010 WL 779283, for the principle that "an expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify."  (Doc. 32, PageID.630) (citing *Abrams*, 2010 WL 779283, at *4) (quoting *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)).  Contrary to Schoen's claim that this was the "particular holding" in *Abrams* (Doc. 32, PageID.630 n.9), *Abrams* in fact found this principle not

applicable, because the expert was acting as a "mere conduit" for another undisclosed expert. *Id.* at *4.  The testifying expert, Dr. Zannetti, was "free to rely on information and data from an expert in formulating *his* opinions.  However, at the end of the day, it is imperative that Dr. Zannetti apply *his knowledge* to the facts and form *his own opinion*."  *Id.* (emphasis added).  But in this case, he was "simply repeating" what the undisclosed expert had told him.  *Id.*  "Such bootstrapping of an undisclosed expert witness' opinions into the reports and testimony of another is plainly improper, where the disclosed expert is treating those opinions as his own (rather than simply relying on information from another expert as underlying data from which he formulates his own expert opinions)."  *Id; see also United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003) (although an expert was permitted to "rely on hearsay evidence for the purposes of rendering an opinion based on his experience," in this case the government's expert was merely "repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules prohibiting hearsay)"; *United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987) (affirming district court's restriction of testimony of  plaintiff's second tax expert which was "nothing more than a personal vouching of one expert for another expert."); *American Key Corp.*, 762 F.2d at 1580 ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."); *Grayson v. No Labels, Inc.*, No. 6:20-CV-1824-PGB-LHP, 2022 WL 1266218, at *5 (M.D. Fla. Apr. 25, 2022) ("An expert may not blindly rely on the conclusion of another expert and still meet the reliability requirements of Rule 702 and *Daubert*."); *Mchale v. Crown Equip. Corp.*, No. 8:19-CV-707-T-27SPF, 2021 WL 289346, at *3 (M.D. Fla. Jan. 28, 2021), *aff'd,* No. 21-14005, 2022 WL 4350702 (11th Cir. Sept. 20, 2022) ("Inappropriate parroting occurs when an expert adopts another expert's opinion

wholesale, without reaching independent conclusions in reliance on that opinion.") (quoting *Fox v. Gen. Motors LLC*, No. 1:17-CV-209-MHC, 2019 WL 3483171, at *26 (N.D. Ga. Feb. 4, 2019)); *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1292 (S.D. Ga. 2018) ("An expert 'may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.' ") (quoting *Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1352 (M.D. Ga. 2015)).

The proffered expert testimony of Darrell Steward, as to the reasonable and necessary costs of repair to Schoen's property, is inadmissible for precisely the same reasons that made Morley's and Belleavoine's testimony inadmissible in *La Gorce Palace Condominiums*.  He is simply serving as the mouthpiece for the findings and conclusions of his estimator, Jay Nielsen, who inspected the Property, apparently used information from the public adjuster's report, came up with the input values based on his judgment as to the scope of repairs needed, and generated a two-page spreadsheet of estimated repair costs.  This spreadsheet is inadmissible hearsay and not within any exception.  Schoen has not argued otherwise.

Rule 703 would permit Steward to form *his own* opinion, based upon any facts or data contained in this spreadsheet, if it contained the kind of facts or data that experts in his field would reasonably rely upon in forming their opinions.  But the problem here is that Steward has *not formed any opinion of his own,* as to the necessary and reasonable costs of repair.  He is simply serving as the mouthpiece of Nielsen who formed the judgments and opinions as to what those costs were in the Nielsen estimate disclosed as the basis of Steward's expert testimony.  At the time his expert opinions were disclosed, with the Nielsen estimate disclosed as the basis for his opinions, Steward had not even visited the Property.  His later inspection of the Property did

not impact the Nielsen estimate and he made no changes to it as a result.  His claim in his affidavit that he "verified" the Nielsen estimate during this walk-through of the Property is contradicted by his deposition testimony, which demonstrated his inability to verify anything about the Nielsen estimate.  But, in any event, whatever he did to "verify" that estimate, his deposition testimony does not reflect any opinions of his own but rather blind reliance upon the opinions in the Nielsen's estimate, without an independent opinion as to what repairs were needed or the costs of those repairs. He was clearly unfamiliar with how Nielsen determined the scope of repairs or the estimated costs of repair.  He had no independent knowledge of those costs or even what some of the abbreviations used by Nielsen meant.  Given Steward's deposition testimony, the only one who could be adequately cross-examined on the Nielsen estimate is Nielsen himself.

Even if Steward were providing any opinions of his own, based upon any information contained in the Nielsen estimate, this estimate is simply another estimator's opinions that Steward seeks to vouch for.  This is impermissible.  *See, e.g., O'Keefe,* 825 F. 2d at 319 (quoted *supra)*; *Abrams*, 2010 WL 779283, at \*4 (quoted *supra*); *PODS Enterprises, Inc.,* 2014 WL 12628662, at \*2 (expert's reference to another expert's surveys in trademark infringement action was inadmissible where expert did nothing more than parrot the other expert's findings and opinions, suggesting they "corroborated" his own opinion that PODS is a well- known brand).

Finally, it is apparent from the testimony of Steward and other evidence described above, that the Nielsen estimate was so poorly prepared, and is so unreliable as an accurate assessment of the reasonable and necessary costs of repair, that no expert could reasonably have relied upon it as the basis for his own opinions. Under Rule 703, the inadmissible facts or data that form the basis of an expert's opinion must be the kinds of facts or data upon which an expert in his field

would "reasonably" rely.   If the data underlying an expert's opinion is "so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *In re TMI Litig.,* 193 F.3d 613, 697 (3rd. Cir. 1999), *amended,* 199 F. 3d 158 (3rd. Cir. 2000).   Steward admitted that the estimate was questionable, indeed erroneous, in numerous respects.  The estimate has the wrong type of roof; a pool liner that did not exist; a pool filter that was not damaged; windows that were not damaged or did not exist; the wrong type of fence; masonry work that Schoen's engineer expert said was not hurricane-related; doors that may not be leaking; roof decking that may not be damaged; blown-in insulation that was not damaged but installed after the hurricane; insulation and house wrap that may or may not have been damaged; and drywall that may not need to be replaced.  Steward testified that the measurements and many other aspects of the estimate were not even Nielsen's work product, but instead pulled from a public adjuster's estimate that Schoen himself has acknowledged was inaccurate and "over the top" (Schoen at 84:14-17) (Doc. 28-1, PageID.226).  It is dubious that the testimony of Nielsen himself, had he been identified as an expert, would have been admissible under Rules 702 and 703, given the unreliability of his findings and his reliance on an over-scoped public adjuster's estimate.

In summary, the Nielsen estimate that forms the basis for Steward's testimony is inadmissible hearsay; is the opinion of another individual, never disclosed as an expert, for whom Steward is being used as a mere conduit; and, in any event, is so unreliable that it cannot serve as the basis for anyone's testimony as to the reasonable and necessary costs of repair.  Steward is so unfamiliar with Nielsen's methodology and reasoning that he cannot be adequately cross-

examined on that estimate.   For these reasons the motion to exclude his expert testimony is due to be granted under Rule 703.

### 2.    Rule 702

Fed. R. Evid. 702, which governs expert testimony, provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>  (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case."

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).   This "gatekeeping" function is to be performed with regard to the admissibility of both expert scientific evidence and expert technical evidence.  *United States v. Frazer,* 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999)).   "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *Id.*

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993).   This "gatekeeping" function is to be performed with regard to the

admissibility of both expert scientific evidence and expert technical evidence.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)).  "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *Id.*

The Eleventh Circuit requires district courts to conduct a three-part inquiry to determine the admissibility of expert testimony:

> "(1) the expert [must be] qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions [must be] sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony [must assist] the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue."

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (alternations added; citation omitted).   The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, the testimony satisfies each part of this inquiry.  *See Id.* (citation omitted).

Steward's testimony is also inadmissible under Rule 702 because his conclusions are not sufficiently reliable under *Daubert* standards and his testimony will not assist the trier of fact. Merely adopting another expert's conclusions is not a methodology that satisfies *Daubert* standards.  *Eberli,* 615 F. Supp. 2d at 1365; *see Bouygues Telecom. S.A. v. Tekelec,* 472 F. Supp. 2d 722, 729 (E. D. N.C. 2007) ("[T]he wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Federal Rules of Evidence 702").  Further, expert testimony that

"simply parrots the opinion of another does not assist the trier of fact, and thus, is inadmissible under Rule 702." *Robinson v. Ford Motor Co.,* 967 F. Supp. 482, 487 n.2 (M.D. Ala. 1997).

## **CONCLUSION**

For the reasons set forth above, State Farm's motion to exclude the expert testimony of Darrell Steward (Doc. 28) is hereby granted.

**DONE and ORDERED** this 1st day of November, 2022.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE